UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ELIZABETH ANN BURNETTE,

                    Plaintiff,

       v.

MICHAEL J. ASTRUE,
Commissioner of Social Security

                    Defendant.
_____

**DECISION AND ORDER**
**No. 12-CV-6270T**

**INTRODUCTION**

Elizabeth Ann Burnette ("Plaintiff") brings this action pursuant to Title XVI of the Social Security Act, seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). Plaintiff alleges that the decision of Administrative Law Judge ("ALJ") Lawrence Levey was not supported by substantial evidence in the record and was based on erroneous legal standards.

Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with the applicable legal standards. Thus, the Commissioner's motion for judgment on the pleadings is granted, and Plaintiff's motion is denied. Plaintiff's complaint is dismissed with prejudice.

**PROCEDURAL HISTORY**

On June 8, 2010, Plaintiff filed an application for SSI benefits, alleging disability since June 8, 2010. Administrative Transcript ("Tr.") 46, 114. On August 6, 2010, her claim was denied. Tr. 47-49. At Plaintiff's request, an administrative hearing was held on August 8, 2011 before ALJ Lawrence Levey. Tr. 21-45. Plaintiff appeared in Rochester, New York, with her attorney, Carrie Smith, and the ALJ presided in Baltimore, Maryland, via videoconference. Tr. 21-23. Both Plaintiff and Marvin Bryant, an impartial vocational expert, testified at the hearing. Tr. 21-45.

On August 31, 2011, the ALJ denied Plaintiff's claim. Tr. 9-17. He found that Plaintiff had not been under a disability within the meaning of the Social Security Act since the date the application was filed. Id.

On March 26, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3. This action followed.

**FACTUAL BACKGROUND**

In Plaintiff's application for SSI benefits, she claimed that her disability was due to a back injury, arthritis in her spine, deafness in the left ear, and mental health issues. Tr. 127. At the hearing, she argued that she met Listing 12.05 of the Social Security Regulations (Mental Retardation). Tr. 27.

## A.  Non-Medical Evidence

Plaintiff was born on June 28, 1959, and was 50 years old at the time of filing.  Tr. 114.  She is a high school graduate who took normal classes and did not require special education.  Tr. 28. She attended college at Bryant and Stratton for a period of time, but she did not complete the program because she had a child.  Tr. 29.

Plaintiff testified that she first noticed her hearing problem "about three years ago."  Tr. 32.  She claimed that her back problem began in 2010.  Tr. 33.  Her doctor prescribed pain medication, which she testified helped her "a little."  Id.

Plaintiff testified that her mental health problems began in 2008 or 2009.  Tr. 34.  A drug and alcohol counselor advised her to seek help for her mental health issues.  Plaintiff also testified that she needed help because she "ha[d] a hard time adjusting," leaving her home, and doing daily activities and that she had sleeping difficulties and heard voices.  Id.  Plaintiff indicated that mental health medications gave her some drowsiness, but they were helping her sleep well at night.  Tr. 36.  She had been drug and alcohol free for one year.  Id.

Plaintiff testified that her daughter usually accompanied her if she had to leave her home, but she was able to take the bus alone and go to her appointments.  Tr. 35.  She spent most of her days at home, but attended individual and group therapy sessions

and attended church, but not every week. Tr. 36-38. Plaintiff was able to feed herself, take care of her personal needs, and perform light house cleaning, although friends helped her with household chores. Tr. 140-41.

At the hearing, the ALJ posed a hypothetical question to impartial Vocational Expert ("VE") Marvin Bryant to determine Plaintiff's employment capabilities. He asked Mr. Bryant to assume a person of the same age and education as Plaintiff, with no work experience, who was limited to light exertion, required the option to sit or stand at will, could only occasionally climb ramps or stairs, could occasionally balance, stoop, kneel, crouch, and crawl, could not climb ladders, ropes, or scaffolds, and had left ear hearing loss. Tr. 42. The ALJ asked Mr. Bryant to further assume that this individual was limited to simple, routine, and repetitive tasks, with only simple work-related decisions with few, if any, changes in the workplace, and only occasional interaction with co-workers, the public, and supervisors. Tr. 43. Mr. Bryant opined that such a person could work as a collator operator (Dictionary of Occupational Titles ("DOT") No. 208.685-010). The exertional level of this job is light and unskilled. Such a person could also work as an apparel stock checker (DOT No. 299.667-014), with the same exertional level of light and unskilled. Such a person could also work as a surveillance system monitor (DOT No. 379.367-101). The exertional level of this job is sedentary and

unskilled.  Id.  Mr. Bryant also opined that if an individual were off task as a result of his or her impairments for 20 percent of the workday, that individual could not engage in full-time, competitive employment at the unskilled level.  Tr. 43-44.

## B.  **Medical Evidence**

On January 23, 2009, Plaintiff was evaluated for depression by Felicia Reed, a Licensed Medical Social Worker ("LMSW") at St. Mary's Mental Health Outpatient Clinic.  Tr. 191-97.  Plaintiff reported a three year history of auditory hallucinations.  Tr. 192. She claimed voices commanded her to do self-harm and be violent. She denied suicidal ideation, but she admitted suicidal thoughts in the past and had attempted suicide one year prior.  Plaintiff had trouble sleeping and reported racing thoughts.

On mental status examination, Plaintiff appeared neat and appropriately attired, and her behavior was cooperative.  Her motor movements, cognition, and insight were unremarkable, and her speech was normal.  Plaintiff's thoughts were logical, and her thought processes were positive for guilt, helplessness, and hopelessness. Her perceptions included visual hallucinations and hearing voices. Her mood was depressed and sad, her affect was congruent, she was alert and fully oriented, and her judgment was good.  LMSW Reed diagnosed Plaintiff with depressive disorder not otherwise specified.

On February 9, 2009, Plaintiff was again seen by LMSW Reed. Tr. 198-205. Plaintiff was neatly and appropriately dressed and exhibited appropriate behavior. She had unremarkable motor movements, thought processes, cognition, and insight. Her speech was normal and her thoughts were logical. Her mood was depressed and her affect was congruent. She was alert and fully oriented, and had fair judgment.

On June 9, 2009, Plaintiff saw Dr. Muhammad Dawood at St. Mary's Mental Health Outpatient Clinic. Tr. 207-14. Plaintiff reported difficulty sleeping, and claimed she heard voices at night for the past five or six years. Mental status examination revealed that Plaintiff's behavior, motor movements, thought, perceptions, and insight were unremarkable. Her speech was soft and underproductive. Plaintiff's mood was sad, and her affect was flat and congruent. She was alert and fully oriented. Her judgment was good, but her memory was poor. Plaintiff exhibited numerous symptoms in the domains of depression, anxiety and psychosis. Dr. Dawood noted that various differential diagnoses were possible.

On August 4, 2009, Plaintiff saw Family Nurse Practitioner (FNP) Wilfred George for an ear infection. Tr. 250. Her left ear had a large amount of pus drainage and was tender to pressure. FNP George assessed otitis media, acute, and otitis externa, chronic. On August 31, 2009, Plaintiff saw FNP George for a followup appointment regarding her ear pain. Tr. 248. She had drainage in

the ear canal that had decreased from the previous visit. Antibiotics had relieved her pain and reduced the drainage. On September 23, 2009, at another followup appointment, Plaintiff had some ear pain and drainage but FNP George reported that her condition was much improved from previous visits. Tr. 246. Plaintiff was alert and oriented, in no acute distress, and reported no pain in the last week.

On October 13, 2009, Plaintiff saw Dr. Dawood. Her behavior, motor movements, thoughts, perceptions, mood, and insight were unremarkable. Tr. 326-27. Plaintiff's affect was flat, she was alert and fully oriented, and she had good judgment.

On November 4, 2009, Plaintiff saw FNP George. Tr. 244. She had drainage in the left ear canal, but it had decreased from previous visits. She was alert and oriented, in no acute distress, and her mood and affect were appropriate. Plaintiff reported that she had pain, but that it did not limit her activities. Id.

On December 9, 2009, Plaintiff saw Dr. Samuel Rosati, her primary care physician. Tr. 242. Plaintiff denied paresthesias in her hands or feet, and denied increased fatigue. She rated her pain at 0/10, and had experienced no pain in the last week. Plaintiff's neurological examination was normal, and she had no weakness in her extremities.

On January 8, 2010, at an appointment with LMSW Reed, Plaintiff's global assessment of functioning ("GAF") was 55.[1] Tr. 205-06. Mental status examination revealed that Plaintiff's behavior was cooperative, and her motor movements, speech, thoughts, perceptions, and cognition were within normal limits. Plaintiff's mood was euthymic, her affect was congruent, and she was alert and fully oriented. Her insight and judgment were fair.

On January 15, 2010, Plaintiff was seen by Dr. Annalisa Overstreet, an otolaryngologist. Tr. 227-28. She reported hearing loss in her left ear since a car accident in the late 1990s in which she sustained trauma to her ear. In 2001, Plaintiff underwent a mastoidectomy for chronic draining ear. She had left-sided otitis externa, and hearing loss in the context of trauma and mastoid surgery. Dr. Overstreet prescribed antibiotic drops for the infection.

On January 29, 2010, Plaintiff saw an audiologist and complained of tinnitus and difficulty hearing from her left ear. Tr. 225. She was attending school at the time, and reported that she did not always hear well in class. Testing revealed moderately severe conductive hearing loss in the left ear. Her right ear hearing was within normal limits. Plaintiff's speech discrimination ability was excellent at very loud but comfortable

---

[1] A GAF of 51 to 60 indicates a person with moderate symptoms or moderate difficulty in social, occupational or school functioning. DSM-IV-TR, 34 (4th ed., rev. 2000).

levels in the left ear, and at average conversational levels in the right ear.

On February 1, 2010, Plaintiff saw FNP George. Tr. 240. Her mood and affect were appropriate, and she reported no pain. On February 22, 2010, LMSW Reed reported that Plaintiff was doing well but that she had trouble sleeping. Tr. 330. Her mental status was largely unchanged. On March 15, 2010, FNP George reported that Plaintiff had increased fatigue, but that her mood and affect were appropriate and she showed no anxiety or agitation. Tr. 238. On April 5, 2010, LMSW Reed reported that Plaintiff was doing well and her sleep had improved. Tr. 333.

On June 10, 2010, Plaintiff saw FNP Sophie Dickinson and complained of back pain for two years. Tr. 234. Physical examination revealed pain and decreased range of motion in her lumbar spine, without obvious deformity. Plaintiff's gait, reflexes, muscle tone, and strength were normal. Her deep tendon reflexes were normal, a Romberg test was normal, and her straight leg raising was negative.

On June 21, 2010, Plaintiff saw Dr. Christine Ransom, a consultative examining psychologist. Tr. 290-94. She complained of depression despite her current treatment. Her medications at that time included Seroquel (100 mg), Ciprofloxacin (500 mg), Budeprion XL (150 mg), Hydrochlorothiazide (25 mg), and Naproxen (500 mg). Mental examination revealed a normal appearance and

normal speech and language. Plaintiff's thought processes, orientation, insight, and judgment were all normal. Her mood and affect were moderately dysphoric. Id. Her attention, concentration, recent and remote memory skills, and cognitive functioning were all moderately impaired. Id. Intellectual testing revealed that Plaintiff had a verbal/comprehensive score of 61, a perceptual/reasoning score of 63, a working/memory score of 66, a processing/speed score of 62, and her full scale IQ was 57. Id.

Dr. Ransom assessed that Plaintiff had a fourth grade reading level, and that her overall intellectual capacity, verbal functioning, perceptual functioning, working memory, and processing speed were in the mildly mentally retarded range. Tr. 292. Plaintiff's general fund of information, ability to form abstract concepts, ability to form visual relationships, attention, concentration, short term memory, and visual processing speed were at the borderline of intellectual functioning level. She was mentally deficient in her ability to form verbal abstractions, vocabulary development, her ability to analyze and synthesize information, arithmetic ability, and her ability to copy designs graphically.

Dr. Ransom further assessed that Plaintiff was moderately limited in: (1) following, understanding, and remembering simple instructions and directions; (2) maintaining basic standards of

hygiene and grooming; and (3) using public transportation. Plaintiff was very limited in: (1) performing complex tasks independently; (2) maintaining attention and concentration for rote tasks; (3) regularly attending to a routine and maintaining a schedule; and (4) maintaining low stress and completing simple tasks. Dr. Ransom opined that Plaintiff appeared permanently disabled, that her condition was not expected to improve, and that she was unable to participate in any activities. She appeared to have a permanent intellectual disability and moderate depressive symptomology.

On June 24, 2010, Plaintiff saw Dr. Dawood. Tr. 217-19. Plaintiff reported that she was sleeping well and that she was not hearing voices anymore. Her behavior, motor movements, thoughts, perceptions, mood, cognition, and insight were unremarkable. Her speech was soft, her affect was congruent, she was alert and fully oriented, and her judgment was good.

On June 25, 2010, Plaintiff saw Dr. Rosati and reported a two to three year history of low back pain. Tr. 231-32. Physical examination of her extremities revealed no cyanosis, clubbing, or edema, and she had a normal range of motion. A musculoskeletal examination was unremarkable, her straight leg raising was negative, and her gait was normal. Id. X-rays of Plaintiff's lumbar spine (dated June 24, 2010) revealed mild degenerative changes.

On July, 12, 2010, Plaintiff saw LMSW Reed and reported that she was doing well. Tr. 222-23. Plaintiff also reported that she had back pain, which increased her depression. She denied any hallucinations. Her behavior was appropriate, and her motor movements, speech, thoughts, and cognition were within normal limits. Plaintiff's mood was euthymic, her affect was congruent, and she was alert and fully oriented. Her insight was fair and her judgment was good.

An MRI of Plaintiff's lumbar spine (dated July 27, 2010) showed mild degenerative changes at L3-L4 and L4-L5. Tr. 383. At L3-L4, there was minimal right and mild left neural foraminal narrowing without spinal stenosis. At L4-L5, there was minimal spinal stenosis with mild bilateral neural foraminal narrowing.

On August 4, 2010, Dr. Harding, a State agency reviewing psychologist, opined that Plaintiff had an affective disorder that did not precisely satisfy the diagnostic criteria of Listing 12.04 of the Social Security Regulations (Affective Disorders). Tr. 270. Further, Dr. Harding assessed the "B" criteria of the listings, which indicate the degree of functional limitations that exist as a result of an individual's mental disorder. Tr. 277. Based on his assessment, Dr. Harding opined that Plaintiff had moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace.

There was insufficient evidence to document repeated episodes of deterioration, each of extended duration.

Dr. Harding also completed a mental residual functional capacity assessment. Tr. 281-82. In the category "understanding and memory," he found that Plaintiff was not significantly limited in the ability to remember locations and work-like procedures, or in the ability to understand and remember very short and simple instructions. She was moderately limited in the ability to understand and remember detailed instructions.

In the category "sustained concentration and persistence," Dr. Harding found that Plaintiff was not significantly limited in the ability to: (1) carry out very short and simple instructions; (2) sustain an ordinary routine without special supervision; (3) make simple work-related decisions; and (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 281-82. Plaintiff was moderately limited in the ability to: (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (4) work in coordination with or proximity to others without being distracted by them.

In the category "social interaction," Dr. Harding found that Plaintiff was not significantly limited in the ability to: (1) interact appropriately with the general public; (2) ask simple questions or request assistance; and (3) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Plaintiff was moderately limited in the ability to accept instructions and respond appropriately to supervisors, and in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

In the category "adaptation," Dr. Harding found that Plaintiff was not significantly limited in the ability to: (1) be aware of normal hazards and take appropriate precautions; (2) travel in unfamiliar places or use public transportation; and (3) set realistic goals or make plans independently of others. She was moderately limited in the ability to respond appropriately to changes in the work setting. As a result of his assessment, Dr. Harding opined that Plaintiff "retain[ed] the ability to perform simple work on a sustained basis." Tr. 283.

On August 9, 2010, Plaintiff saw Dr. Rosati. Tr. 305. Her extremities showed no cyanosis, clubbing, or edema, and she had a normal range of motion. Plaintiff's back was unremarkable, her straight leg raising was negative, and her gait was normal.

On November 29, 2010, Plaintiff saw Kristin Kelly, a counselor, and reported that she was doing well. Tr. 341-42. Her

perceptions were normal, her mood was depressed, and her affect was congruent. There was no apparent deficit in her cognition. On December 21, 2010, Plaintiff saw FNP George. Tr. 315. Her extremities showed no cyanosis, clubbing, or edema, and she reported no pain in the last week. She showed no anxiety or agitation, and she reported no special needs related to learning. On December 27, 2010, Plaintiff again saw counselor Kelly and stated that she was doing well and her depression had decreased. Tr. 346.

On February 11, 2011, Plaintiff reported to counselor Kelly that she was doing fairly well, but had been experiencing anxiety and worry related to upcoming medical appointments. Tr. 348-61. Her thoughts were logical and coherent, but she had phobias. Plaintiff's cognition showed no deficit, and she was alert and oriented. On March 25, 2011, counselor Kelly reported that Plaintiff's GAF was 60. Her mental status was largely unchanged.

On April 12, 2011, FNP George reported that Plaintiff had no costovertebral angle tenderness and had normal extremities. Tr. 321. She was alert and fully oriented, her mood and affect were appropriate, and she showed no anxiety or agitation. That same day, Plaintiff also saw LMSW Crystal Keefer. Tr. 374. LMSW Keefer reported that Plaintiff appeared mildly depressed. Her thoughts contained feelings of guilt, preoccupations, and worthlessness, and

she reported hearing voices. Plaintiff's cognition showed no apparent deficit.

LMSW Keefer completed a psychological assessment form regarding Plaintiff's employability (dated April 12, 2011). Tr. 296-97. Plaintiff's chief complaint and history of present illness were depression and anxiety in an outpatient setting. She interacted appropriately with others, was never violent toward herself or others, and never lost a job or failed to complete education or training due to psychiatric episodes. LMSW Keefer reported that, on occasion, Plaintiff had been hospitalized for alcohol or drug abuse. Plaintiff had made prior attempts at abstaining from alcohol and drugs, and she had occasional black-out episodes. Plaintiff's behavior occasionally interfered with her activities of daily living, she had attempted suicide, and she had occasional decompensation (episodes of psychosis).

LMSW Keefer assessed that Plaintiff was very limited in: (1) following, understanding, and remembering simple instructions and directions; (2) demonstrating the capacity to maintain attention and concentration for rote tasks; and (3) demonstrating the capacity to regularly attend to a routine and maintain a schedule. Tr. 298. Plaintiff was moderately limited in demonstrating the capacity to perform simple and complex tasks independently. She had normal functioning in demonstrating the capacity to maintain basic standards of hygiene and grooming, and

demonstrating the capacity to perform low stress and simple tasks. Plaintiff was also capable of using public transportation independently. LMSW Keefer assessed that Plaintiff needed to focus solely on treatment for 90 days, and abstain from all work, due to her depression and anxiety worsening under work conditions. Tr. 298-99.

On May 5, 2011, LMSW Keefer reported that Plaintiff's appearance and behavior were appropriate, and her motor movements were unremarkable. Tr. 377. Her speech was soft, her thought form was logical and coherent, and she had no abnormal perceptions. Plaintiff's mood was depressed, her affect was within a normal range, and her cognition showed no apparent deficit. She was alert and fully oriented, and her insight and judgment were good. At an appointment on May 23, 2011, Plaintiff's mental status was largely unchanged. Tr. 380-407. On June 9, 2011, counselor Kelly reported that Plaintiff's concentration was poor, her insight was superficial, and her judgment was fair.

On June 20, 2011, Dr. Andrea Coca evaluated Plaintiff for the possibility of lupus. Tr. 401-02. Plaintiff reported no joint pain or swelling, no stiff or painful muscles, and no back pain. She also reported no anxiety or depression, and no difficulty sleeping. Physical examination revealed full range of motion of her back. At the hearing with the ALJ, Plaintiff testified that she did not have lupus. Tr. 31.

On July 8, 2011, Dr. Dawood reported that Plaintiff's GAF was 64.[2] Tr. 410-16. Plaintiff also saw counselor Kelly that day, who reported that Plaintiff had been getting out more and had been seeing her family. Plaintiff's appearance was appropriate, and her motor movements were restless. Her thought form showed blocking, but her thought process was unremarkable. Her mood was depressed, her affect was constricted, her concentration was poor, and she was distractable. She was sedated, but fully oriented, and exhibited superficial insight and fair judgment.

## DISCUSSION

### I.   Jurisdiction and Scope of Review

Title 42 U.S.C., Section 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Mathews v. Eldridge, 424 U.S. 319, 320 (1976). When considering such a claim, the section directs the Court to accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. See Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998); see also Williams v. Comm'r of Soc. Sec., No. 06-CV-2019, 2007 U.S. App. LEXIS 9396, at *3 (2d Cir. Apr. 24, 2007).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

---

[2]  A GAF of 61-70 indicates a person with some mild symptoms or some difficulty in social, occupational or school functioning, but who is generally functioning pretty well and has some meaningful interpersonal relationships. DSM-IV-TR, 34 (4th ed., rev 2000).

Consolidated Edison Co. v. NLRB, 305 U.S. 197, 217 (1938). The Court's scope of review is thus limited to determining whether the Commissioner's findings were supported by substantial evidence in the record, and whether the Commissioner employed the proper legal standards in evaluating Plaintiff's claim. Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983)(finding that a reviewing Court does not try a Social Security benefits case *de novo*). The Court must "scrutinize the record in its entirety to determine the reasonableness of the decision reached." Lynn v. Schweiker, 565 F. Supp. 265, 267 (S.D. Tex. 1983).

Judgment on the pleadings pursuant to Rule 12(c) may be granted where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639 (2d Cir. 1988). If, after reviewing the record, the Court is convinced that Plaintiff has not set forth a plausible claim for relief, judgment on the pleadings may be appropriate. See generally Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).

## II. **The Commissioner's Decision to Deny Benefits is Supported by Substantial Evidence in the Record.**

In his decision denying benefits, the ALJ followed the required five-step analysis established by the Social Security

Administration for evaluating disability claims.[3]  Tr. 9-17.  At step one of the analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date. Tr. 11.

At steps two and three, the ALJ concluded that Plaintiff had the following severe combination of impairments: depression, anxiety, left ear hearing loss, degenerative disc disease, substance abuse in remission by self-report, and possible borderline intellectual functioning.  He found, however, that none of Plaintiff's severe impairments, alone or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926).

At steps four and five, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work[4]

---

[3]     The five-step analysis requires the ALJ to consider the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment which significantly limits his or her physical or mental ability to do basic work activities; (3) if the claimant suffers a severe impairment, the ALJ considers whether the claimant has an impairment which is listed in Appendix 1, Subpart P, Regulation No.4, if so, the claimant is presumed disabled; (4) if not, the ALJ considers whether the impairment prevents the claimant from doing past relevant work; (5) if the claimant's impairments prevent him or her from doing past relevant work, if other work exists in significant numbers in the national economy that accommodate the claimant's residual functional capacity and vocational factors, the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v).

[4]     **20 C.F.R. 416.967(b): Light work.** Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

except she required the option of alternating between sitting and standing, could only occasionally climb ramps or stairs, could only occasionally engage in balancing, stooping, kneeling, crouching, or crawling, was precluded from climbing ladders, ropes, or scaffolds, and had a moderately severe left ear hearing loss.  Tr. 13. Additionally, she was limited to performing simple, routine, and repetitive tasks, in a work environment free of fast paced production requirements, involving only simple work related decisions, with few, if any, changes in the work place, and she should have no more than occasional interpersonal interaction with the public, coworkers, and supervisors.  The ALJ found that, given the Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform (20 C.F.R. 416.969 and 416.969(a)).  Tr. 16.  Thus, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  This Court finds that the ALJ's decision is supported by substantial evidence in the record and is based on the appropriate legal standards.

A.  **The ALJ Did Not Err in Finding that Plaintiff's Impairments Were Not of the Severity to Meet the Listings of the Social Security Regulations.**

At step three, after reviewing the medical evidence of the record in its entirety, the ALJ found that Plaintiff's impairments

did not meet or medically equal a listed impairment of the Social Security Regulations. Tr. 11. The ALJ noted that Plaintiff "d[id] not allege that she ha[d] any impairments of listing level severity, nor ha[d] she met her burden of presenting medical evidence that support[ed] such a finding." Id. In her brief, however, Plaintiff argues that her impairments are of the severity to meet Listing 12.05(B) and/or (C) (Mental Retardation).[5] This Court finds that the ALJ did not err in finding that Plaintiff's impairments were not of the severity to meet or medically equal Listing 12.05.

In assessing the paragraph "B" and "C" criteria of Listing 12.05, the ALJ concluded that they were not met because Plaintiff did not have a valid verbal, performance, or full scale IQ of 59 or less, and she did not have a valid verbal performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. Although Dr. Ransom, a consultative examiner, assessed

---

[5]     **12.05 *Mental Retardation:*** Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied...

B.     A valid verbal, performance, or full scale IQ of 59 or less; OR

C.     A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; OR

that Plaintiff had a full scale IQ of 57, the ALJ rightly rejected this test as invalid.

In rejecting this test as invalid, the ALJ explained that "Dr. Ransom's test score is the only evidence that [Plaintiff] exhibits any intellectual deficit, and is inconsistent with a host of evidence from [Plaintiff]'s treating sources." Id. For example, Dr. Dawood routinely noted that Plaintiff had normal cognition, and her therapists and counselors repeatedly reported that Plaintiff had "no apparent cognitive deficit." See e.g., Tr. 195, 203, 206, 212, 218-19, 223, 327, 331, 333-34, 342, 349, 355, 361, 377, 380. The "ALJ is not required to accept a claimant's IQ scores when they are inconsistent with the record." Vasquez-Ortiz v. Apfel, 48 F.Supp.2d 250, 257 (W.D.N.Y. 1999).

The ALJ also discounted Dr. Ransom's assessment based on its nature as a form report. Tr. 15. Form reports, in which a source's only obligation is to fill in a blank or check off a box, are entitled to little weight in the adjudicative process. See, e.g., Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (terming form reports "weak evidence at best"); Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (holding that the ALJ "permissibly rejected" three psychological evaluations "because they were check-off reports that did not contain any explanation of the bases of their conclusions"); O'Leary v. Schweiker, 710 F.2d 1334, 1341 (8th Cir. 1983) ("[W]hile these forms are admissible, they are

entitled to little weight and do not constitute 'substantial evidence' on the record as a whole").

Moreover, Plaintiff failed to show that any possible intellectual deficits manifested before age 22. On the contrary, Plaintiff testified that she graduated high school and was not in special education classes. Tr. 28. She also reported that she attended college for a period of time. Tr. 29. Furthermore, she alleged that she became disabled in 2008, 27 years after she turned 22. Tr. 46, 114. She alleged disability based on pain, deafness, and mental health issues, not disability due to intellectual deficits. Tr. 127.

It is within the province of the ALJ to weigh conflicting evidence in the record and credit that which is more persuasive and consistent with the record as a whole. See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)); Schaal v. Apfel, 134 F.2d 496, 504 (2d Cir. 1998) ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record."). The determination that Dr. Ransom's full scale IQ assessment of Plaintiff was unreliable, as it is the only mention in the record that Plaintiff had intellectual limitations, is supported by substantial evidence. Thus, this Court finds that the ALJ correctly determined that Plaintiff did not meet the paragraph "B"

or "C" criteria of Listing 12.05.

**B.    The ALJ's Residual Functional Capacity Finding is Supported by Substantial Evidence.**

In assessing a claimant's RFC, the ALJ must consider all of the relevant medical and other evidence in the case record to assess the claimant's ability to meet the physical, mental, sensory, and other requirements of work.    20 C.F.R. § 404.1545(a)(3)-(4); see also SSR 96-8p, SSR LEXIS 5, 1996 WL 374184 (S.S.A. July 2, 1996).   Here, the ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. 416.967(b) except she required the option of alternating between sitting and standing, could only occasionally climb ramps or stairs, could only occasionally engage in balancing, stooping, kneeling, crouching, or crawling, was precluded from climbing ladders, ropes, or scaffolds, and had moderately severe left ear hearing loss. Tr. 13. She was also limited to performing simple, routine, and repetitive tasks, in a work environment free of fast paced production requirements, involving only simple work-related decisions, with few, if any, changes in the work place, and she should have no more than occasional interpersonal interaction with the public, coworkers, and supervisors.   Id.   In making this determination, the ALJ considered all symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence (based on the requirements of 20 C.F.R. 416.929 and SSRs 96-4p and 96-7p),

and he considered opinion evidence in accordance with the requirements of 20 C.F.R. 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.  Id.

Plaintiff contends that the ALJ's RFC determination was against the weight of the evidence because he failed to properly evaluate treating and examining medical source opinions.  Pl.'s Mem. at 12.  Specifically, Plaintiff argues that the ALJ erred in affording Dr. Harding, a state psychological consultant, "considerable weight," and affording LMSW Keefer, a treating therapist, and Dr. Ransom, an examining psychologist, "little weight."  Id. at 11.  As discussed previously, this Court finds that the ALJ did not err in determining that Dr. Ransom's full scale IQ assessment of Plaintiff was unreliable, and, thus, he rightfully afforded Dr. Ransom's opinion little weight.

Dr. Harding opined that Plaintiff retained the ability to perform simple work on a sustained basis.  Tr. 283.  In concluding that Dr. Harding's opinion should be given considerable weight, the ALJ noted that "State agency psychological consultants are deemed by regulation to be highly qualified experts in Social Security disability determinations (20 C.F.R. 416.927(f)(2)(i)), and his opinion is consistent with the record as a whole and based upon a comprehensive review of the record[]."  Tr. 15.  The opinions of state agency medical consultants constitute expert opinion evidence that can be given weight if supported by medical evidence of the

record, as in this case.  See Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983).

LMSW Keefer opined (on a psychological assessment form) that Plaintiff was very limited in her ability to follow, understand, and remember simple instructions, maintain attention and concentration for rote tasks, and regularly attend to a routine and maintain a schedule.  Tr. 298-99.  She also opined that Plaintiff was moderately limited in her capacity to perform simple and complex tasks independently.  LMSW Keefer concluded that Plaintiff would not be able to work for 90 days.  The ALJ gave her opinion little weight because of its nature as a form report, and because LMSW Keefer is not an acceptable medical source (20 C.F.R. 416.913(a) and 416.913(d)) and her "assessed limitations were inconsistent with the contemporaneously prepared treatment notes, [Plaintiff]'s actual activities of daily living, and [Plaintiff]'s level of social activity."  Tr. 16.

According to SSR 06-3p, "only 'acceptable medical sources' can be considered treating sources... whose medical opinions may be entitled to controlling weight."  SSR 06-3p.  "Acceptable medical sources" are further defined by regulation as licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists.  20 C.F.R. 416.913(a).  In contrast, therapists are defined as "other sources" whose opinions may be considered with respect to the severity of the claimant's

impairment and ability to work, but need not be assigned controlling weight. 20 C.F.R. 416.913(d)(1). The ALJ "has the discretion to determine the appropriate weight to accord the [other source]'s opinion based on the all evidence before him." <u>Diaz v. Shalala</u>, 59 F.3d 307, 314 (2d Cir. 1995); <u>see</u> <u>also</u> <u>Genier v. Astrue</u>, 298 F. App'x 105, 108-09 (2d Cir. 2008) ("[M]any of the key medical opinions cited during the benefits period at issue were those of a physician's assistant and a nurse practitioner – and not a physician. As such, the ALJ was free to discount the assessments accordingly in favor of the objective findings of other medical doctors. There was no treating physician error."); <u>see</u> <u>also</u> <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983).

LMSW Keefer was an "other source" rather than an acceptable medical source under the Regulations and, thus, she could not be a "treating source" for purposes of the treating physician rule. Thus, this Court finds that the ALJ did not err in declining to afford LMSW Keefer's opinion greater weight. Further, after reviewing the treatment notes of LMSW Keefer, this Court finds that the ALJ correctly determined that they were inconsistent with the form report showing greater limitations. Accordingly, this Court finds that the ALJ properly assessed LMSW Keefer's opinion.

## C. The ALJ Applied the Appropriate Legal Standards Regarding Plaintiff's Credibility and his Assessment is Supported by the Record.

Plaintiff argues that the ALJ failed to apply the appropriate legal standards for assessing her credibility. When assessing a claimant's credibility, an ALJ may not simply state in a conclusory manner that he finds the claimant to be not credible. Rather, the ALJ's decision must contain specific reasons for his finding that are supported by evidence in the record. See SSR 96-7p, 1996 WL 374186, *4 (S.S.A.). The decision must explain to the individual and a reviewing court the weight given to the testimony and the reasons for the determination. See id.

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not credible to the extent they are inconsistent with the... residual functional capacity assessment." Tr. 14. The ALJ's decision contained specific reasons supported by the evidence for discounting Plaintiff's credibility, and he correctly evaluated Plaintiff's statements in making his RFC determination. Tr. 14-15; see also SSR 96-3p and 96-7p.

The ALJ concluded that Plaintiff was "partially credible" regarding her hearing impairment. Tr. 14. As such, he included

her moderately severe left ear hearing loss in the assessed residual functional capacity. Id.

The ALJ also concluded, however, that Plaintiff was "less than fully credible" regarding the limitations imposed by her back impairment. Id. In support of this conclusion, the ALJ noted that X-rays showed that Plaintiff had only mild degenerative changes, and that MRI testing showed mild degenerative changes, specifically mild foraminal narrowing without significant stenosis at L3-L4 and minimal spinal stenosis with mild bilateral neural foraminal narrowing at L4-L5. Tr. 231, 383. Despite these mild degenerative changes, Dr. Rosati found that Plaintiff was in no acute distress, had a normal range of motion and a normal gait, had a negative sitting straight leg-raising test, and that her musculoskeletal exam was unremarkable. Tr. 232. Furthermore, Plaintiff often reported to her treating providers that she received relief from pain medication and was doing well. Tr. 330, 333, 341, 346, 348, 379.

The ALJ also concluded that Plaintiff was "less than fully credible" regarding her mental health limitations. Tr. 14. He noted that Plaintiff reported to her treating providers that her depression improved since she stopped using mood altering drugs, and that she had been doing well. Tr. 330, 333, 341, 346, 348, 379. Furthermore, Plaintiff's therapists reported that she had GAF scores that indicated only moderate impairment-related limitations,

and that her most recent mental health reports noted a GAF of 64, which indicates no more than mild impairment-related limitations. Tr. 205, 360, 410.  To further support his credibility conclusion, the ALJ noted that "[Plaintiff]'s ability to use public transportation, attend church, and shop for food is inconsistent with the degree of social isolation she alleges, and her ability to manage her own money is inconsistent with the degree of cognitive impairment alleged."  Tr. 15, 139-49.

"It is the Secretary's function not the district court's to appraise the credibility of witnesses, including the plaintiff." <u>Serra v. Sullivan</u>, 762 F. Supp. 1030, 1034-35 (W.D.N.Y. 1991). Thus, for the stated reasons, this Court finds that the ALJ's credibility determination is supported by substantial evidence.

   D.   **The ALJ Appropriately Relied Upon the Vocational Expert's Testimony in Making his RFC Determination.**

Plaintiff contends that because the ALJ erred in evaluating the medical findings and making his RFC determination, the vocational expert's testimony cannot be relied upon to provide substantial evidence for supporting a denial of disability.  Pl.'s Mem. at 15.   Plaintiff argues that because the hypothetical questions posed to the vocational expert were based upon an RFC determination that did not accurately and completely describe Plaintiff's limitations, the vocational expert's testimony is unreliable.   <u>Id.</u>   Thus, it is Plaintiff's position that the Commissioner did not meet his burden at step five of the analysis,

which requires a showing that work exists in significant numbers in the national economy that accommodates Plaintiff's RFC and vocational factors. As discussed previously, however, this Court finds that the ALJ's RFC determination was proper.

Based on his RFC determination, the ALJ correctly posed a hypothetical question to the vocational expert, Mr. Bryant. Mr. Bryant was told to assume an individual with the same age and education as well as lack of relevant work experience as Plaintiff, with the following series of abilities and limitations: the individual was limited to the light exertional category as defined in the regulations, required the option of alternating between sitting and standing, could only occasionally climb ramps or stairs and could only occasionally engage in balancing, stooping, kneeling, crouching, and crawling, was precluded from climbing ladders, ropes, or scaffolds, and had moderate use of the left ear due to hearing loss. Tr. 42. Additionally, Mr. Bryant was to assume that this individual was limited to performing simple, routine, and repetitive tasks in a work environment via fast-paced production requirements and one that involved only simple work-related decisions with few, if any, changes in the workplace, and that the individual should have no more than occasional interpersonal interaction with co-workers, the public, and supervisors. Tr. 42-43.

Based on this hypothetical scenario, Mr. Bryant testified that such an individual could perform the function of a collator operator, an apparel stock checker, and a surveillance system monitor. Tr. 43. Thus, based on his proper RFC determination and the testimony of the vocational expert, this Court finds that the ALJ correctly concluded that Plaintiff could perform other work in the national economy.

## CONCLUSION

For the reasons stated, this Court finds that the Commissioner's denial of SSI benefits to Plaintiff was based on substantial evidence in the record and was not erroneous as a matter of law. Accordingly, the Commissioner's decision is affirmed. This Court grants Commissioner's motion for judgment on the pleadings. Plaintiff's motion for judgment on the pleadings is denied, and Plaintiff's complaint is dismissed with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

**S/Michael A. Telesca**

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     July 8, 2013
           Rochester, New York